UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
EDWIN POLLARD,

                Petitioner,        REPORT & RECOMMENDATION

      -against-            11 Civ. 5712 (RMB) (MHD)

SUPERINTENDENT PAUL GONYEA,

            Respondent.
------------------------------x

TO THE HONORABLE RICHARD M. BERMAN, U.S.D.J.:

    Pro se petitioner Edwin Pollard seeks a writ of habeas corpus to challenge his 2009 conviction in New York State Supreme Court, Bronx County, on one count of assault in the second degree. The trial court sentenced Pollard to a prison term of five years, with an additional supervised-release term of three years.

    Petitioner presses three claims in support of his petition. He complains that he was denied effective assistance of trial counsel because his attorney failed to request a justification charge, that the trial court denied him his right to counsel by not granting a request to change his appointed attorney and that new evidence has surfaced that demonstrates that the principal witness against him committed perjury by claiming that Pollard had stabbed him in the chest rather than in some other part of his body. In connection

1

with his last claim he appears to suggest, at least in his reply papers, that the prosecutor knew that the victim's testimony was false and actively misled the court and that his attorney improperly failed to challenge that testimony or to undertake an adequate pretrial investigation.

Respondent asserts that the first ineffective-assistance claim is procedurally barred but urges the court to reject it on the merits. As for the choice-of-counsel claim, the State argues that the claim is both moot and otherwise meritless. Finally, insofar as petitioner argues witness perjury, respondent notes that the claim is unexhausted and procedurally barred and is, in any event, groundless.

For the reasons that follow, we conclude that the three claims are meritless and hence recommend that the writ be denied and the petition dismissed.

PRIOR PROCEEDINGS

Pollard's conviction stemmed from his non-fatal stabbing of a man named Edward Herrmann on July 11, 2007. The police arrested Pollard the same day, and a Bronx County grand jury returned a

seven-count indictment charging him with single counts of first- and second-degree attempted assault, second- and third-degree assault, and fourth-degree criminal possession of a weapon and two counts of third-degree menacing. Petitioner filed an omnibus suppression motion to preclude identification testimony and the use of his post-arrest statement to the police in which he admitted that he may have stabbed Herrmann. After a hearing, the court denied that motion. (Villecco Decl. Ex. 2 (Resp't's App. Br.) at 3).

Pollard went to trial on January 15, 2009[1] before the Hon. David Stadtmauer and a jury. At trial the State presented testimony of Mr. Herrmann, Ms. Faye DeCosta (a former girlfriend of Pollard), Ms. DaCosta's sister Carla Hill, and the arresting police officer. Pollard testified in his own defense.

Based on the evidence presented by the prosecution, the jury was free to find that Pollard had stabbed Herrmann after a series of hostile exchanges both the day before the stabbing and the day of the crime. Pollard and DeCosta testified that on July 10, 2007

---

[1] The transcript itself is actually dated January 15, 2008. Given the dates of prior hearings in Pollard's case, we assume this to be a typographical error.

3

they were in each others' company when they encountered Pollard, who was a former boyfriend of DeCosta. According to these two witnesses, Pollard angrily asked DeCosta "Who the fuck is this?", referring to Herrmann. Herrmann introduced himself, but Pollard refused to shake his hand. (Tr. 14-16, 18, 20, 48-49, 53, 57, 123-26, 186). Herrmann then stepped away as Pollard and DeCosta began to argue. When Pollard shoved DeCosta, Herrmann stepped between them, at which point Pollard said "Stay right there. I'll be back". As he walked into DeCosta's nearby building, DeCosta told Herrmann that Pollard had a set of keys to DeCosta's apartment. (Tr. 21-23, 32-33, 124, 126-27, 188). Herrmann followed Pollard into the building, grabbed him and demanded to know what he was going to get. He then punched Pollard in the face and warned him not to threaten Ms. DeCosta, indicating that he could end up in jail, and that if he wished to fight, Herrmann was ready to do so. During this altercation Herrmann also said "Little people like you get fucked for things like this in prison. If you abuse women, you deserve to be abused". Herrmann also took Pollard's cell phone, broke it and threw it out of a window. He then demanded that Pollard return Ms. DeCosta's apartment keys, and Pollard complied. At that point Pollard left on his bicycle, saying "I will be back. I will be back." (Tr. 23-26, 32, 57-61, 71-72, 74, 128-33, 180-83, 185-86, 189).

4

Less than an hour later, Pollard rang the downstairs buzzer to the apartment of Ms. Carla Hill, Ms. DeCosta's sister. When Ms. Hill descended, he told her -- as he kept his hand in his pocket -- that he had a gun and was going to hurt DeCosta and her "little boyfriend" and that he would burn DeCosta's apartment. He then left on his bicycle. (Tr. 77, 82-85). Hill communicated this event by phone to DeCosta, who was with Herrmann and became notably upset. (Tr. 26-29, 35, 85-86, 90, 135-37).

The next day, at DeCosta's request, Herrmann went to Hill's apartment to pick up DeCosta's work clothes. He left with a bag and, while walking away from her apartment on the street, he encountered Pollard riding his bicycle. Pollard, who was an estimated thirty-six feet from Herrmann at the time, jumped off his bicycle, rushed at Herrmann, pulled a knife and stabbed him in his upper abdomen below the heart. Pollard then dropped the knife and walked away with his bicycle. (Tr. 34, 138-50, 173-75, 190).

Herrmann, who was bleeding, walked to the apartment of DeCosta's mother, where DeCosta was staying, told DeCosta that Pollard had stabbed him and asked her to call the police, which she did. (Tr. 36-37, 144-45, 150-51). In response to the call, Officer Elisha Duncan came to the apartment and observed Herrmann bleeding

5

from the abdomen. Herrmann reported that Pollard had stabbed him and provided the officer with a physical description of his assailant. Herrmann then went to St. Barnabas Hospital, where doctors used four staples to seal the wound. He suffered discomfort from the wound, including sleep interruption for about two weeks, and limited shoulder movement while the staples were in place. Eventually the wound healed, leaving a permanent scar. (Tr. 38, 98-100, 103, 161, 163-66).

After leaving the apartment, Officer Duncan proceeded to 176th Street and Monroe Avenue, where other officers had stopped Pollard, still in possession of his bicycle. He admitted to the officers that he believed that he had stabbed Herrmann after his fight with him the day before and that he had discarded the knife in the vicinity of Jerome Avenue and Mount Hope. DeCosta came to the location and identified Pollard, and the next day Herrmann identified him from a lineup. (Tr. 40, 100-04, 106, 109-12, 115, 170-71).

Pollard testified in his own defense.[2] He reported that on

---

[2] Respondent has apparently been unable to locate the portion of the trial transcript that includes Pollard's testimony. (See Villecco Decl. ¶ 4 (reporting inability to locate portions of trial transcript, though failing to indicate that any of the

July 10, 2007, he had been staying at DeCosta's apartment and went downstairs, where he encountered DeCosta and Herrmann. According to Pollard he asked DeCosta "Who's that guy?", and she said that he was a friend. Herrmann tried to shake hands, but Pollard refused. He then said to DeCosta that he would talk to her about money that she owed him, but only in her apartment. He proceeded to walk into the building, at which point Herrmann followed him, saying "Oh you're too good to shake my hand." Pollard reported that he ran up the stairs but that Herrmann grabbed him in a choke hold. Pollard bit Herrmann's hand, and Herrmann punched him in the face, saying "I'll take you for a ride where they can't find you. . . We fuck little niggers like you in jail." (Resp't's App. Br. at 8-9; Villecco Decl. Ex. 1 (Def.'s App. Br.) at 5-6). Pollard narrated that Herrmann had then seized Pollard's cell phone and thrown it out the window, and that he also had grabbed the apartment keys from Pollard. According to Pollard, DeCosta then entered the building and told Herrmann to stop fighting, at which point Pollard left the premises. (Resp't's App. Br. at 9; Def.'s App. Br. at 6).

Pollard recounted that he then stopped at Hill's building and

---

missing portions included testimony). The state appellate briefs, however, contain a detailed summary of that testimony, and there appears to be no dispute between the parties as to the substance of that testimony.

7

asked her "Who's that guy [DeCosta's] with? This guy beat me up for no reason.", to which Hill replied that he was a family friend. Pollard reported that he had then said, "If I had a gun, I would kill him." He then left and went home. (Resp't's App. Br. at 9).

As described by Pollard, the next day he spent some time repairing his bicycle with the use of a broken four-inch-long paring knife. He reported that he then put the knife in his pocket and was walking his bike near 176th Street and Walton Avenue, when he saw Herrmann standing some distance away on the sidewalk. He testified that Herrmann said "Run now. I told you I know where you live. Run now, you little bitch." At that point, Pollard claimed, Herrmann began to run toward him. Pollard, by his own admission, continued to walk towards Herrmann, and when he recognized the other man, he pulled the knife from his pocket and swung it at Herrmann to avoid being grabbed by the throat. According to Pollard, Herrmann then ran away. (Id. at 9-10; Def.'s App. Br. at 6-7). Pollard resumed walking with his bicycle, when police officers ordered him to stop and asked if he had just been in a fight. In response he admitted that he had and said "I sw[u]ng the knife and I think I cut him." (Resp't's App. Br. at 10).

The jury ultimately acquitted Pollard of attempted first-

8

degree assault but convicted him of second-degree assault. (Id. at 1, 12). Justice Stadtmauer subsequently sentenced Pollard to a determinate prison term of five years, with three years of supervised release. (Id. at 1; Def.'s App. Br. at 1).

Petitioner filed a direct appeal from his conviction. In his brief he asserted that he had been denied effective assistance of trial counsel because his attorney had chosen not to seek a justification instruction even though the prosecutor had suggested that it was appropriate in light of Pollard's trial testimony. He also argued that his right to effective counsel had been violated because he had repeatedly advised the trial court in the months leading up to trial that he was dissatisfied with his appointed attorney, and yet the court refused to inquire as to the basis for his unhappiness and declined to allow a change of counsel even though at one point the lawyer herself had said that she and her client had irreconcilable differences. (Def.'s App. Br. at 12-30).

The First Department unanimously affirmed the conviction. People v. Pollard, 78 A.D.3d 618, 912 N.Y.S.2d 192 (1st Dep't 2010). In rejecting petitioner's challenge to his attorney's decision to eschew the justification defense, the panel first noted that Pollard had failed to pursue this claim by way of a section

9

440.10 motion, which would have created an evidentiary record on which to assess counsel's performance and that this omission made the claim "unreviewable". Id. at 618, 912 N.Y.S.2d at 193. The panel then proceeded, however, to consider the merits of the claim to the extent that the record permitted such review and concluded that Pollard had not shown that his attorney's performance was constitutionally deficient. In this regard the court noted that there were strategic reasons not to invoke the defense formally, which would trigger a complete instruction to the jury as to the limitations of that defense. In particular, the court noted that Pollard had admitted using a knife to strike near the victim's heart even though he knew that Herrmann was unarmed. Since the justification defense would not be applicable to the use of deadly physical force in these circumstances, the panel implied that the attorney may well have decided to avoid having the jury so instructed in that case, leaving it to the jury informally to apply a self-defense theory to acquit. Id. As for the change-of-counsel issue, the court held that the claim was moot because the Legal Aid Society had replaced the trial attorney about whom Pollard had complained and had done so before the start of the trial. Id.

Petitioner sought leave to appeal from this decision to the New York Court of Appeals, but that court denied his application.

People v. Pollard, 17 N.Y.2d 799, 952 N.Y.S.2d 1102 (2011).

     In January 2010, while Pollard's appeal was still pending, he
filed a pro se section 440.10 motion to vacate his conviction. In
support of that request, he asserted that Herrmann had committed
perjury by testifying that he had been stabbed in the chest, since
the medical records, not used at trial, showed only a stab wound in
the abdomen. He further claimed that the prosecutor had lied to the
court about this matter. (Villecco Decl. Ex. 3). By order dated May
12, 2010, Justice Stadtmauer denied the motion, observing that
Pollard's application rested on purely conclusory "self-serving"
assertions unsupported by evidence or corroborating details,
including the medical records to which Pollard alluded. According
to the court, these omissions precluded any basis for vacatur or
for holding an evidentiary hearing, as Pollard had requested. (Id.
Ex. 5). In the wake of this decision, Pollard did not seek leave to
appeal the ruling to the Appellate Division. (Villecco Decl. ¶ 10).

     Pollard filed a second pro se section 440.10 motion, dated
June 22, 2010. This application largely reiterated the prior one
but seemed to articulate a revised theory that petitioner had been
denied effective representation of counsel because the lawyer had
not challenged the victim's testimony that he had been stabbed in

11

the chest. (Id. Ex. 6).

By Decision and Order dated December 6, 2010, Justice Stadtmauer denied this motion, noting that Pollard's claims of witness perjury, prosecutorial misconduct, insufficiency of trial evidence, ineffective counsel and judicial error and misconduct were all asserted in a conclusory and self-serving fashion. He also observed that the claims of perjury, prosecutorial misconduct and insufficiency of trial evidence had previously been asserted by Pollard in his first motion, which the court had denied. Treating the current motion as one for reargument on these matters, he found no basis to reexamine the prior decision. Finally, the court noted that the sufficiency of the evidence was a matter that could be raised on direct appeal, and accordingly he declined to reach that question. (Villecco Decl. Ex. 8). As was the case with Pollard's first section 440.10 motion, he did not seek leave to appeal to the Appellate Division from this adverse ruling. (Villecco Decl. ¶ 12).

Following the exhaustion of his direct appellate remedies in the state courts, Pollard turned to this court, filing his habeas petition dated July 29, 2011.

12

ANALYSIS

Petitioner asserts here the two claims that his counsel raised on his direct appeal as well as the central complaint that he aired in his two section 440.10 motions. Before addressing these claims, we summarize the standards by which a habeas court is to review challenged decisions of the state courts.

I. Habeas Standard of Review

The stringency of federal habeas review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, then the petitioner may obtain relief only if the state court's ruling "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

13

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002). "[I]f the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo.'" Dolphy v. Mantello, 552 F.3d 236, 238 (2d Cir. 2009) (quoting Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006)).

"Clearly established" federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

14

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "A federal court may not grant habeas simply because, in its independent judgment, the 'relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. The Second Circuit has interpreted this language to mean that while "[s]ome increment of incorrectness is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

The Supreme Court's most recent decision on this issue reflects a seemingly narrower view of what constitutes an "unreasonable" application of federal law. It states that "[a] state court's determination that a claim lacks merit precludes

15

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

As for the state court's factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the

16

burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S. v. Carpinello, 589 F.3d 75, 80-81 (2d Cir. 2009); McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).

## II.  The Sixth Amendment Claim: Waiver of a Justification Defense

Petitioner first argues that he was denied the effective assistance of trial counsel, because his lawyer chose, apparently quite deliberately, to forego a justification defense. He asserts, in substance, that in his own testimony he admitted the elements of the crime of second-degree assault and hence his only hope of acquittal rested on the jurors agreeing that he had acted in reasonable self-defense. By foregoing that defense and arguing to the jury, inter alia, that the State had not proven intent to cause injury, counsel acted unreasonably, and his error likely caused Pollard's conviction.

Respondent asserts that this claim is procedurally barred because the appellate panel observed that Pollard had failed to raise it on a section 440.10 motion, as he should have done.

17

Nonetheless, respondent urges that this court reach the merits of the claim and reject it as baseless. (Resp't's Mem. of Law at 4-5).

We conclude that the claim is not procedurally barred, but that it is without merit. Accordingly, we recommend its dismissal.

A. Procedural Bar

If the highest state court to address a federal-law claim disposed of it on a "state law ground that is independent of the federal question and adequate to support the judgment," a petitioner may not obtain habeas review unless he demonstrates both cause for his default and prejudice or else establishes that a failure to address the claim would constitute a fundamental miscarriage of justice. E.g., Coleman v. Thompson, 501 U.S. 722, 729 (1991); Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) (quoting Harris v. Reed, 489 U.S. 255, 260 (1989)). If the state court rejects a claim as unpreserved and then, in the alternative, notes that it would have rejected the claim on its merits if it had considered it, then the ruling is still considered to rest on procedural grounds. See, e.g., Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (state court's "contingent observation" is not an "adjudication on the merits" for purposes of habeas review); Green

18

v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

To be independent, the state court's holding must rest on state law that is not "interwoven with the federal law." Jimenez, 458 F.3d at 137 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). Since it can be "'difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference,' . . . reliance on state law must be 'clear from the face of the opinion.'" Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000) (quoting Coleman, 501 U.S. at 732, 735). Accord, e.g., McKethan v. Mantello, 522 F.3d 234, 237-38 (2d Cir. 2008) (per curiam). When determining whether we may entertain a claim, we "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000)).

As for adequacy, the state procedural requirement must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." Murden v. Artuz, 497 F.3d 236, 241 (2d Cir. 2007) (quoting Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)); see Lee v.

19

Kemna, 534 U.S. 362, 376 (2002); Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003) (quoting Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999)). However, even "[s]tate rules that are firmly established and regularly followed will not foreclose review of a federal claim where the particular application of the rule is 'exorbitant.'" Brown v. Lee, 2011 WL 3837123, at *5 (S.D.N.Y. Aug. 30, 2011) (quoting Kemna, 534 U.S. at 376). In assessing adequacy, the Second Circuit has adopted from Kemna three general considerations as pertinent to the analysis. These are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the . . . court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Murden, 497 F.3d at 192 (quoting Cotto, 331 F.3d at 240). The federal court, in making this determination, owes deference to the state courts, and should find a state procedural-default ruling adequate as long as it has "a fair or substantial basis in state law." Garcia, 188 F.3d at 78 (citing, inter alia, Arce v. Smith, 889 F.2d 1271, 1273 (2d Cir. 1989)) (internal quotation marks

20

omitted). It bears emphasis that "[b]ecause of comity concerns, a decision that a state procedural rule is inadequate should not be made 'lightly or without clear support in state law.'" <u>Murden</u>, 497 F.3d at 192 (quoting <u>Garcia</u>, 188 F.3d at 77).

We assume for purposes of our analysis that a holding by the Appellate Division that petitioner erred in not pursuing his Sixth Amendment claim first by a section 440.10 motion and that this omission was fatal to his appellate argument would be adequate. The New York Court of Appeals has cautioned that "[g]enerally, the ineffectiveness of counsel is not demonstrable on the main record" so "in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding brought under CPL 440.10." <u>People v. Brown</u>, 45 N.Y.2d 852, 853-54, 410 N.Y.S.2d 287, 287 (1978); <u>see</u> <u>also</u> <u>People v. Harris</u>, 109 A.D.2d 351, 360, 491 N.Y.S.2d 678, 687 (2d Dep't 1985) (citing cases) (stating that "[t]he Court of Appeals has time and time again advised that ineffective assistance of counsel is generally not demonstrable on the main record"). "'Where the ineffective assistance of counsel claim is not record-based, federal habeas courts have held that the rule of CPL § 440.10(2)(c) is not adequate' to bar habeas review." <u>McCollough v. Bennett</u>, 2010 WL

114253, *6 (E.D.N.Y. Jan. 12, 2010) (quoting <u>Byron v. Ercole</u>, 2008 WL 2795898, *13 (E.D.N.Y. July 18, 2008)).[3]

The failure of Pollard to press his claim initially before the trial court appears to fall within this range of cases because, by proceeding directly to the appellate court, he deprived the courts of the opportunity to review whatever explanation the trial attorney may have had for his decision as to how to proceed and why he chose to forego the justification defense. The factual predicates for this aspect of the Sixth Amendment analysis were not part of the pre-existing record and hence were simply not available to the Appellate Division.

That said, however, the decision of the Appellate Division on this claim cannot be said to rest on an independent state-law ground. After noting that petitioner had failed to follow the required procedure and that as a result the claim was "unreviewable" insofar as it did not reflect the trial counsel's reasons for his

---

[3] There are circumstances in which the claimed errors of counsel may be adequately assessed from the record before the trial court, and in such cases, the defendant may be required to pursue such claims on his direct appeal. <u>E.g.</u>, <u>People v. Moore</u>, 66 A.D.3d 707, 710-12, 886 N.Y.S.2d 468, 471-73 (2d Dep't 2009); <u>People v. Nusbaum</u>, 222 A.D.2d 723, 725 634 N.Y.S.2d 852, 854 (3d Dep't 1995) (citing <u>People v. English</u>, 215 A.D.2d 871, 873, 627 N.Y.S.2d 105, 107 (3d Dep't 1995)).

approach, the court did not say that as a result it would not address the merits. Rather, it proceeded directly to specify that it would nonetheless consider the merits insofar as the claim could be assessed in light of the record before it, presumably because a rationale for the trial attorney's approach was implicit in the record. The panel then proceeded to analyze Pollard's claim, concluding that it was meritless because Pollard had "not shown the 'absence of strategic or other legitimate explanations' for counsel's choice of defenses." 78 A.D.3d at 618, 912 N.Y.S.2d at 193. More specifically, the panel noted that a justification defense could not succeed "unless the jury was persuaded that even though [petitioner] swung a knife at an unarmed opponent that cut him just below the heart, this did not constitute deadly physical force as defined in Penal Law § 10.00(11)." Id. It also observed that "a competent attorney" could well "have concluded that his client was better off with the jury not knowing about the legal limitations on the use of deadly physical force." Id. (citing N.Y. Penal Law § 35.15[2][a]). It then concluded that Pollard had not demonstrated that his attorney "should have pursued a justification defense, or that the absence of such a defense caused him any prejudice." Id.

In short, the court did not refuse to consider the merits of the claim, and did not clearly address the merits only as an

23

alternative to an articulated holding that it was rejecting the claim for procedural reasons. Given the presumption against finding that a state-court ruling was based on an independent state-law ground when the court's reasoning is ambiguous on that point, this mode of articulation must be deemed to amount to a decision on the merits. Compare, e.g., Bell, 500 F.3d at 155, with Zarvela v. Artuz, 364 F.3d 415, 417 (2d Cir. 2004) (per curiam); Dinh v. Rock, 2011 WL 6329699, *4 (E.D.N.Y. Dec. 16, 2011). Accordingly, we do not view the claim as procedurally barred from consideration here. We further note that since the decision of the Appellate Division is presumed to rest on the merits, the required deference embodied in section 2254(d) applies to our review of the state court's ruling.

B. The Merits

As for the merits of the claim, to demonstrate ineffective assistance of counsel a petitioner must show that his lawyer's performance was "so defective that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,'" "and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). As summarized in Brown:

24

> To satisfy the first, or "performance," prong,
> the defendant must show that counsel's
> performance was "outside the wide range of
> professionally competent assistance," and to
> satisfy the second, or "prejudice," prong, the
> defendant must show that "there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the
> proceeding would have been different."

Id. at 79-80 (quoting Strickland, 466 U.S. at 690, 694); accord,
e.g., Smith v. Spisak, 130 S.Ct. 676, 685 (2010); Palacios v. Burge,
589 F.3d 556, 561 (2d Cir. 2009); Henry v. Poole, 409 F.3d 48, 62-64
(2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004).

It bears emphasis that the Strickland standard is quite
deferential, and that a claim of constitutional dimension does not
arise unless a lawyer's error is so egregious as to amount to a
failure to provide minimal professional representation. Thus, a
habeas court weighing an ineffective-assistance claim "must judge
the reasonableness of counsel's challenged conduct on the facts of
the particular case, viewed as of the time of counsel's conduct,"
and must "determine whether, in light of all the circumstances,
[counsel's] identified acts or omissions were outside the wide range
of professionally competent assistance." Strickland, 466 U.S. at
690; accord, e.g., Kimmelman v. Morrison, 477 U.S. 365, 386 (1986);
Loliscio v. Goord, 263 F.3d 178, 192 (2d Cir. 2001). In making this

25

determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

The burden of proving prejudice is equally onerous. As noted, the petitioner must demonstrate "a reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001) (citing Strickland, 466 U.S. at 694).

Petitioner cannot meet these standards, and at the very least the appellate court's conclusion to that effect was neither inconsistent with Supreme Court precedent nor an unreasonable application of it.

The justification defense is embodied in N.Y. Penal Law §§ 35.15. Under its terms, a person is authorized to "use physical force upon another person when and to the extent that he . . . reasonably believes such to be necessary to defend himself . . . from what he . . . reasonably believes to be the use or imminent use

26

of unlawful physical force by such other person", provided that the
unlawful physical force was not provoked by the actor. The statute
precludes the use of "deadly physical force", however, unless the
actor

> reasonably believes that such other person is
> using or about to use deadly physical force.
> Even in such a case, however, the actor may not
> use deadly physical force if he knows that with
> complete personal safety, to [himself] and
> others he . . . may avoid the necessity of so
> doing by retreating . . .

N.Y. Penal Law § 35.15(2)(a). See also N.Y. Penal Law
§§ 35.15(2)(b) & (c) (authorizing deadly force to prevent certain
enumerated crimes, including kidnapping, rape, robbery and
burglary). "Deadly physical force" is defined to cover "physical
force which, under the circumstances in which it is used, is
readily capable of causing death or other serious physical injury."
N.Y. Penal Law § 10.00(11). Given these provisions, a justification
defense in this case would plainly have failed.

The law in New York is clear that the use of a knife to slash
another man near his heart or in the abdomen -- a version supported
both by the victim and by the newly proffered medical records --
constitutes deadly physical force. See, e.g., People v. Steele, 19
A.D.3d 175, 175-76, 798 N.Y.S.2d 391, 391 (1st Dep't 2005); accord,

27

e.g., People v. Jones, 24 A.D.3d 815, 816, 805 N.Y.S.2d 169, 171 (3d Dep't 2005); see also Almonte v. Lake, 2006 WL 839073, *10 (S.D.N.Y. Mar. 30, 2006). Since Pollard conceded that his victim was unarmed at the time, the statute appears to preclude the use of a justification defense by petitioner. E.g., Steele, 19 A.D.3d at 176, 798 N.Y.S.2d at 391. Furthermore, given the testimony of Pollard himself that he saw Herrmann at an initial distance of thirty-six feet and continued to walk toward him even as he perceived danger, it appears that petitioner had a means of retreat, which would also preclude invocation of the defense. See, e.g., People v. Hall, 48 A.D.3d 1032, 1033, 849 N.Y.S.2d 743, 744 (4th Dep't 2008).

Given these evident problems with invoking the justification defense, it was reasonable for defense counsel to pursue an alternative approach, emphasizing the asserted failure of the prosecutor to prove that Pollard intended to injure Herrmann, who, at least in Pollard's version of events, was the aggressor. (See Resp't's App. Br. at 12) (citing defense counsel's summation reference to lack of proof of intent to injure). At the very least, this approach was not so deficient as to constitute the denial of

28

minimal professional representation.[4]

Moreover, even if counsel had sought a jury instruction on this point and the court had granted it, the record reflects that it is entirely implausible that a properly instructed jury would have found that Pollard met the statutory requirements. Hence petitioner fails to demonstrate either inadequate representation or prejudice. Finally, in any event the Appellate Division's holding in this respect was obviously not an unreasonable application of Supreme Court precedent.

III. <u>The Refusal to Replace Defense Counsel</u>

On several occasions Pollard communicated with the court in the months, and then the days, before the trial to express unhappiness with his then-appointed counsel. On each occasion, however, the court declined to investigate the matter and did not order a change of attorney. (Villecco Decl. ¶ 13 & Exs. 9-12). Before trial, however, the attorney about whom Pollard was

---

[4] Indeed, as the appellate panel hinted, counsel may well have assumed that his client would be better off by letting the jurors themselves take the threat from Herrmann into consideration without a jury instruction that would have limited them in applying whatever version of a self-defense defense that they thought appropriate.

complaining was replaced by another Legal Aid lawyer, whose performance petitioner did not criticize in the trial court. (See Resp't's App. Br. 23-26).

When petitioner raised this issue on appeal, the Appellate Division held that the claim was moot since the criticized attorney had been replaced. Pollard, 78 A.D.3d at 618-19, 912 N.Y.S.2d at 193. That ruling was certainly correct.

Petitioner offered no basis for asserting that the pretrial conduct of his first attorney prejudiced him in terms of the result of the trial, and hence he was not pressing a potentially viable claim for denial of effective representation. Thus, his claim reduced to the complaint that he had a right to a replacement appointed counsel, an assertion inconsistent with the Supreme Court's decision in Wheat v. United States, 486 U.S. 153, 159 (1988). In any event, as the appellate panel noted, he did receive a new attorney, thus mooting his substitution claim.[5]

_____

[5] As we note above, Pollard did complain on his appeal about that second attorney's decision not to pursue a justification defense, but for reasons noted that Sixth Amendment claim is meritless.

IV. The Testimony of The Victim

Petitioner's remaining claim is a pastiche of allegations that the testimony of Mr. Herrmann was perjurious insofar as he asserted that Pollard had stabbed him in the chest. Petitioner further accuses the prosecutor of knowingly proffering this purportedly false testimony, complains about the trial judge countenancing it also, and finally asserts that his trial attorney was constitutionally incompetent for not uncovering the falsehood. In support of this argument, Pollard proffers a medical document apparently reflecting the treatment of Herrmann by the Emergency Medical Service immediately after the stabbing. (Pet. at last attach.).

Pollard first presented elements of this claim in his two section 440.10 motions, both of which the trial court denied. Since he never sought leave to appeal from these denials, he plainly failed to exhaust his state-court remedies. See, e.g., Gruyair v. Lee, 2011 WL 4549627, *6 (S.D.N.Y. Oct. 3, 2011) ("Exhaustion requires that the factual and legal basis for each claim be fairly presented to the highest available state court and that the petitioner utilize all available mechanisms to secure appellate review of the denial of that claim.") (citing, inter alia, Galdamez

31

v. Keane, 394 F.3d 68, 72 (2d Cir. 2005); Torres v. McGrath, 407 F.

Supp.2d 551, 557 (S.D.N.Y. 2006); Mayen v. Artist, 2008 WL 2201464,

*4 (S.D.N.Y. May 23, 2008)) (internal quotation marks omitted); see

also Galdamez, 394 F.3d at 73 (noting that a petitioner must allow

the  state  courts  "one  full  opportunity  to  resolve  any

constitutional issues by invoking one complete round of the State's

established appellate review process") (emphasis omitted); Ramirez

v. Att'y Gen. of N.Y., 280 F.3d 87, 94 (2d Cir. 2001) (discussing

presentation of claims to the New York Court of Appeals, in which

review is discretionary). That said, respondent asks that we bypass

the exhaustion analysis and deny the claim or claims on the merits

under section 2254(b)(2). (Resp't's Mem. of Law at 24). That is the

appropriate approach.


The point that Pollard seems to want to make is that although

Herrmann assertedly testified that he had been stabbed in the

chest, he was actually stabbed in the abdomen. Petitioner seems to

imply that this alleged inaccuracy led to a flawed result in the

trial, although he fails to explain why.


In any event, his argument is plainly misguided. Herrmann

testified that "when [petitioner] came up with the blade, he was

coming straight at me. The way I saw it, he was coming towards the

32

heart. I blocked it and again he stabbed me just below the heart area." (Tr. 148, 152). In testifying, Herrmann pointed to where he had suffered the stab wound, and the prosecutor characterized the location, without objection, as "the area below the left pectoral muscle in the upper left torso area." (Tr. 148). In addition, the State introduced two photographs of the stab wound, thus presumably allowing the jury to decide where Herrmann had been wounded. (See Tr. 162-64). Finally, the medical record proffered by Pollard is entirely consistent with this evidence, since it refers to a left-side abdomen stab wound. (See Pet. at last attach.).

   Apart from these problems with petitioner's argument, the precise location of the wound, whether in the lower chest or upper abdomen, does not affect the viability of the verdict. Petitioner was convicted of second-degree assault, which requires proof that the defendant, "[w]ith intent to cause physical injury to another person, . . . causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; . . ." N.Y. Penal Law § 120.05(2). The testimony of Herrmann and that of Pollard himself establish all of these elements, since petitioner approached Herrmann, pulled a knife while doing so, swung the knife at Herrmann's torso, and apparently took a second swing with the knife when initially blocked by Herrmann, slashing

33

him in the process. There is also no question that the knife, as used, was a dangerous instrument. See, e.g., People v. Brown, 52 A.D.3d 1237, 1238, 859 N.Y.S.2d 548, 548 (4th Dep't 2008); People v. Prior, 23 A.D.3d 1076, 1076, 804 N.Y.S.2d 877, 878 (4th Dep't 2005); People v. Vincent, 231 A.D.2d 444, 445, 647 N.Y.S.2d 205, 205 (1st Dep't 1996).

In sum, Pollard proffers no evidence of false testimony, and the trial evidence, whether with or without the medical record, was ample to sustain the conviction.

CONCLUSION

For the reasons stated, we recommend that the writ be denied and the petition dismissed with prejudice. We further recommend denial of a certificate of appealability, as petitioner fails to raise any grounds justifying appellate review. See, e.g., Cintron v. Fisher, 2012 WL 213766, *3 (S.D.N.Y. Jan. 24, 2012) (citing Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 111-12 (2d Cir. 2000)); see also 28 U.S.C. § 2253(c)(2).

Pursuant to Rule 72 of the Federal Rules of Civil procedure, the parties shall have fourteen (14) days from this date to file

written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard M. Berman, Room 1320, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).


Dated:  New York, New York
        March 14, 2012



                              RESPECTFULLY SUBMITTED,


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE


35

Copies of the foregoing Report and Recommendation have been mailed today to:

Mr. Edwin H. Pollard
# 62142054
U.S.P. - Coleman 1
United States Penitentiary
P.O. Box 1033
Coleman, Florida 33521-1029

Karen Swiger, Esq.
Assistant District Attorney
 for Bronx County
198 East 161st Street
Bronx, New York 10451

36